## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TITAN INTERNATIONAL, INC.,**<br><br>and<br><br>**740 QUEEN STREET ASSOCIATES LLC,**<br><br>       Plaintiff,<br><br>       v.<br><br>**AXIS SURPLUS INSURANCE COMPANY,**<br><br>**ASCOT SPECIALTY INSURANCE COMPANY,**<br><br>**ASCOT GROUP LIMITED** *d/b/a* **ASCOT GROUP,**<br><br>**ASCOT SYNDICATE NO. 1414,**<br><br>**QBE SYNDICATE NO. 1886,**<br><br>**TOKIO MARINE KILN SYNDICATE NO. 510,**<br><br>**TOKIO MARINE KILN SYNDICATE NO. 1880,**<br><br>**CERTAIN UNDERWRITERS AT LLOYDS OF LONDON,**<br><br>**LLOYD'S AMERICA, INC.,**<br><br>**ENGLE MARTIN & ASSOCIATES, LLC,**<br><br>**SYNERGY ADJUSTING, LLC,**<br><br>**RSG UNDERWRITING MANAGERS, LLC,**<br><br>and<br><br>**WKFC, A SERIES OF RSG UNDERWRITING MANAGERS, LLC,**<br><br>       Defendants. | Case No. 26-4320 |

**COMPLAINT**

Plaintiff Titan International, Inc., and 740 Queen Street Associates LLC (hereinafter collectively "Plaintiffs"), by counsel, file this Complaint against Defendants AXIS Surplus Insurance Company, Ascot Specialty Insurance Company, Ascot Group Limited *d/b/a* Ascot Group, Ascot Syndicate No. 1414, QBE Syndicate No. 1886, Tokio Marine Kiln Syndicate No. 510, Tokio Marine Kiln Syndicate No. 1880, Certain Underwriters at Lloyds of London, Lloyd's America, Inc., Engle Martin & Associates, LLC, Synergy Adjusting, LLC, RSG Underwriting Managers, LLC, and WKFC, a Series of RSG Underwriting Managers, LLC, (hereinafter collectively "Defendants") and in support thereof, state as follows:

**INTRODUCTION**

1. This is a breach of contract, bad faith, and declaratory judgment action arising out of Defendants' improper denial of a commercial property insurance claim submitted by Plaintiffs.

2. Plaintiff 740 Queen Street Associates LLC ("QSA") owns a building located at 740 Queen Street, Pottstown, Pennsylvania ("Insured Property"), which it leases to Plaintiff Titan International, Inc. ("Titan").

3. The Insured Property is insured by two commercial property insurance policies: one issued by Defendant AXIS Surplus Insurance Company ("AXIS"), and one issued by Certain Underwriters at Lloyds of London on behalf of Ascot Specialty Insurance Company, Ascot Group Limited *d/b/a* Ascot Group, Ascot Syndicate No. 1414, QBE Syndicate No. 1886, Tokio Marine Kiln Syndicate No. 510, and Tokio Marine Kiln Syndicate No. 1880 (collectively with Lloyd's America, Inc. "Lloyd's Defendants" or "Lloyd's"). The policies provide coverage for direct physical loss or damage to the Insured Property up to a total of $2,500,000 per occurrence.

4. This case arises out of an incident where an underground fire suppression line on

2

the Insured Property failed, causing water to flood the basement for approximately ten days. Simultaneously, bathroom fittings on the upper floor of the Insured Property also failed.

5.      Plaintiffs engaged Pye-Barker Fire & Safety ("Pye-Barker") to conduct an initial assessment and repair of the failed line.  Plaintiffs engaged Pye-Barker's Pennsylvania branch, Keystone Fire and Security ("KFS"), to complete the repairs.  KFS's final invoice reflected a total cost of $188,923.04.

6.      Shortly after receiving initial estimates for the work, Plaintiffs reported this claim to its insurance broker.  Later, on July 24, 2025, Plaintiffs' insurance broker reported this claim to Lloyd's.  Due to a labeling issue, the claim was reported to AXIS on or around September 26, 2025.

7.      AXIS and Lloyd's engaged Defendant Engle Martin & Associates, LLC ("Engle Martin") to serve as claims administrator and adjuster.  Engle Martin conducted an inspection of the Insured Property on October 6, 2025.  During the inspection, Engle Martin's representative inspected the "exterior location" of the failed line but was not able to inspect the line itself.  After this single inspection, Engle Martin attempted via email to get Plaintiffs to agree that the cause of the failure was "wear and tear."  Engle Martin did so on behalf of the insurers to try to obtain an admission from Plaintiffs that Engle Martin could use as a basis for denying coverage.  Plaintiff disagreed and explained that the failure was caused by a burst of high-pressure water.

8.      Defendants never investigated whether the failure was caused by a burst of high-pressure water but instead later maintained the blind assumption that the failure was caused by wear and tear.

9.      After several months passed—during which Plaintiffs made repeated requests for updates—Defendants finally issued a coverage denial letter on February 10, 2026, more than 200

3

days after the claim was first reported.

10.  Pennsylvania law required Defendants to complete their investigation within 30 days, and to provide written explanations for any delay every 45 days thereafter.  31 Pa. Code § 146.6.  Defendants did neither.

11.  When Defendants finally issued their denial letter, it was legally deficient.  The letter quoted policy language at length but provided no analysis, no reasoning, and no explanation connecting any of the cited exclusions to the specific facts of this claim.  Consequently, Plaintiffs did not understand why Defendants were denying coverage.  Defendants' actions violated Pennsylvania's requirement that an insurer provide "a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim."  40 Pa. C.S. § 1171.5(a)(10)(xiv).

12.  Defendants' actions—including but not limited to, their delay in completing their investigation, their failure to thoroughly and properly investigate this matter, their conclusory assumption that the cause of failure was "wear and tear," and their failure to provide any reasonable basis for denying Plaintiffs' claim—show that Defendants had no reasonable basis to deny Plaintiffs' claim and recklessly disregarded the same, constituting bad faith under 42 Pa. C.S. § 8371.

13.  On April 10, 2026, Plaintiffs, through counsel, sent Defendants a formal letter identifying the deficiencies in the denial and requesting that Defendants reverse the denial and confirm coverage.  As of the filing of this Complaint (approximately two and a half months after Plaintiffs sent their April 10, 2026 letter), Defendants still have not substantively replied to this letter and have not reversed their denial of coverage.

14.  Accordingly, Plaintiffs bring this action for breach of contract, declaratory

4

judgment, and bad faith under 42 Pa. C.S. § 8371. As a result of Defendants' bad faith conduct and serious delay, Plaintiffs have suffered damages in excess of $180,000.00, and are further entitled to interest, punitive damages, and attorney fees under Pennsylvania's bad faith statute.

## PARTIES

15. Plaintiff Titan International, Inc. is a corporation organized under the laws of the State of New Jersey with its headquarters at 740 Queen Street, Pottstown, Pennsylvania 19464, making its principal place of business Pennsylvania. Thus, Titan is a citizen of New Jersey and Pennsylvania for jurisdictional purposes.

16. Plaintiff 740 Queen Street Associates LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its headquarters at 740 Queen Street, Pottstown, Pennsylvania 19464. The sole member of QSA is Christopher V. Devone, who resides in Pennsylvania. Thus, QSA is a citizen of Pennsylvania for jurisdictional purposes.

17. Upon information and belief, Defendants' information is as follows:

18. Defendant AXIS Surplus Insurance Company is a corporation organized under the laws of the State of Illinois with its headquarters at 10000 Avalon Boulevard, Suite 200, Alpharetta, Georgia 30009, making its principal place of business Georgia. Thus, AXIS is a citizen of Illinois and Georgia for jurisdictional purposes.

19. Defendant Ascot Specialty Insurance Company is a corporation organized under the laws of the State of Delaware with its principal executive office, and thus its principal place of business, at 825 Town & Country Lane, Suite 500, Houston, Texas 77024. Thus, Ascot Specialty Insurance Company is a citizen of Delaware and Texas for jurisdictional purposes.

20. Defendant Ascot Group Limited d/b/a Ascot Group is a corporation organized under the laws of the United Kingdom with its principal address, and thus its principal place of

5

business, at 27 Richmond Road, Pembroke HM 08, Bermuda. Thus, Ascot Group is a foreign citizen for jurisdictional purposes.

21.    Defendant Ascot Syndicate No. 1414 is an underwriting syndicate owned solely by Ascot Corporate Name Limited. Ascot Corporate Name Limited is a private limited company organized under the laws of the United Kingdom with its principal place of business at 20 Fenchurch Street, London, England, EC3M 3BY.[1] Thus, Ascot Syndicate No. 1414 is a foreign citizen for jurisdictional purposes.

22.    Defendant QBE Syndicate No. 1414 is an underwriting syndicate owned solely by QBE European Operations PLC and/or QBE Insurance Group Limited. QBE European Operations PLC is a public limited company organized under the laws of the United Kingdom with its principal place of business at 30 Fenchurch Street, London, United Kingdom, EC3M 3BD.[2] QBE Insurance Group Limited is an Australian public company organized under the laws of Australia with its principal place of business at 388 George Street, Sydney, New South Wales, Australia.[3] Thus, QBE Syndicate No. 1414 is a foreign citizen for jurisdictional purposes.

23.    Defendant Tokio Marine Kiln Syndicate No. 510 is an underwriting syndicate owned solely by Tokio Marine Kiln. Tokio Marine Kiln is a private limited company organized under the laws of the United Kingdom with its principal place of business at 20 Fenchurch Street,

---

[1] Even if Ascot Corporate Name Limited were treated as an unincorporated association, upon information and belief, it does not appear to have any members in New Jersey or Pennsylvania.

[2] Even if QBE European Operations PLC were treated as an unincorporated association, upon information and belief, it does not appear to have any members in New Jersey or Pennsylvania.

[3] Even if QBE Insurance Group Limited were treated as an unincorporated association, upon information and belief, it does not appear to have any members in New Jersey or Pennsylvania.

London, England, EC3M 3BY.[4]  Thus, Tokio Marine Kiln Syndicate No. 510 is a foreign citizen for jurisdictional purposes.

24.    It appears that Defendant Tokio Marine Kiln Syndicate No. 1880 merged into Tokio Marine Kiln Syndicate No. 510 in early 2025.  However, it is named separately in an abundance of caution.  Tokio Marine Kiln Syndicate No. 1880 was an underwriting syndicate owned solely by Tokio Marine Kiln.  Tokio Marine Kiln is a is a private limited company organized under the laws of the United Kingdom with its principal place of business at 20 Fenchurch Street, London, England, EC3M 3BY.  Thus, Tokio Marine Kiln Syndicate No. 1880 is a foreign citizen for jurisdictional purposes.

25.    Defendant Certain Underwriters at Lloyds of London appears to be a vehicle for the other Lloyd's Defendants rather than an independent entity but has been named as a defendant pending discovery in case it is a separate entity.  Certain Underwriters at Lloyds of London is headquartered in London, UK, and does not appear to be incorporated in the United States or owned by anyone in the United States.  Thus, Certain Underwriters at Lloyds of London, like the other Lloyd's Defendants, is a foreign citizen for jurisdictional purposes.

26.    Defendant Lloyd's America, Inc. is a corporation organized under the laws of the State of New York with its principal executive office, and thus its principal place of business, at 280 Park Avenue, East Tower 25th Floor, New York, New York 10017.  Thus, Lloyd's America is a citizen of New York for jurisdictional purposes.

27.    Defendant Engle Martin & Associates, LLC is a limited liability company organized under the laws of the State of Georgia with its headquarters at 5565 Glenridge

---

[4] Even if Tokio Marine Kiln were treated as an unincorporated association, upon information and belief, it does not appear to have any members in New Jersey or Pennsylvania.

Connector, Suite 900, Atlanta, Georgia 30342. Engle Martin appears to be owned solely by Cor Partners, Inc., which is a corporation organized under the laws of Missouri with its principal executive office, and thus its principal place of business, at 5565 Glenridge Connector, Suite 900, Atlanta, Georgia 30342. Thus, Engle Martin is a citizen of Georgia and Missouri for jurisdictional purposes.

28.   Defendant Synergy Adjusting, LLC is a limited liability company organized under the laws of the State of Georgia with its headquarters at 5565 Glenridge Connector, Suite 900, Atlanta, Georgia 30342. Synergy appears to be owned by Cor Partners, Inc., which is a corporation organized under the laws of Missouri with its principal executive office, and thus its principal place of business, at 5565 Glenridge Connector, Suite 900, Atlanta, Georgia 30342. The only individuals or other entities listed in Synergy's filings as a limited liability company are citizens of Georgia, and these filings do not indicate that Synergy has any members who are citizens of New Jersey or Pennsylvania. Thus, Synergy is a citizen of Georgia and Missouri for jurisdictional purposes.

29.   Defendant RSG Underwriting Managers, LLC is a limited liability company organized under the laws of the State of Delaware with its headquarters at 155 North Wacker Drive, Chicago, Illinois 60606. Its sole publicly listed member is Ryan Specialty, LLC, a limited liability company organized under the laws of the State of Delaware with its headquarters at 155 North Wacker Drive, Chicago, Illinois 60606. Ryan Specialty, LLC's sole publicly listed member is Ryan Specialty Holdings, Inc., which is a corporation organized under the laws of the State of Delaware with its headquarters at 155 North Wacker Drive, Chicago, Illinois 60606. There are no records indicating that RSG Underwriting Managers, LLC or Ryan Specialty, LLC has any other members. Thus, RSG is a citizen of Illinois and Delaware for jurisdictional purposes.

30.    Defendant WKFC appears to be a department of Defendant RSG Underwriting Managers, LLC, but has been named as a defendant pending discovery in case it is a separate entity from Defendant RSG Underwriting Managers, LLC.  Accordingly, WKFC, like RSG, is a citizen of Illinois and Delaware for jurisdictional purposes.

## JURISDICTION AND VENUE

31.    As discussed above, Plaintiffs are citizens of Pennsylvania and New Jersey and Defendants are citizens of Delaware, Georgia, Illinois, Missouri, New York, Texas, and foreign countries.  Thus, there is complete diversity of citizenship between Plaintiffs and Defendants in this matter.  And as explained more fully below, the insurance claim that Defendants wrongfully denied was for over $180,000.  Plaintiffs are also entitled to (1) interest at a rate "equal to the prime rate of interest plus 3%," (2) punitive damages, and (3) the insured's court costs and attorney fees under 42 Pa. C.S. § 8371.  Thus, the amount in controversy in this action, exclusive of interest and costs, exceeds $75,000.  Accordingly, this Court has jurisdiction over this dispute under 28 U.S.C. § 1332.

32.    This Court has general personal jurisdiction over Engle Martin & Associates, LLC, Synergy Adjusting, LLC (formerly Synergy Adjusting Corporation, Inc.), and RSG Underwriting Managers, LLC because they are registered to do business in Pennsylvania.  42 Pa. C.S. § 5301(a)(3)(i) (providing that "qualification as a foreign entity under the laws of" Pennsylvania enables Pennsylvania "to exercise general personal jurisdiction over" such entities); *see also Mallory v. Norfolk S. Ry.*, 600 U.S. 122 (2023) (upholding this provision).

33.    This Court also has personal jurisdiction over Defendants because this case "aris[es] from such person[s][] . . . [c]ontracting to insure any person, property, or risk located within this Commonwealth at the time of contracting." 42 Pa. C.S. § 5322(a)(6)(i); *see also McGee*

*v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (holding that such connections also satisfy the Due Process Clause of the federal Constitution).   Specifically, Defendants contracted to insure the Insured Property, which has at all times been located within the Commonwealth of Pennsylvania, and this case arises from those contracts.

34.     Additionally, the AXIS Policy provides in relevant part:

It is agreed that in the event of the failure of the Insurer providing coverage under this Policy to pay any amount claimed to be due hereunder, the Insurer, at the request of the Insured will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

Likewise, the Lloyd's Policy provides in relevant part:

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.

For these reasons also, this Court has personal jurisdiction over Defendants.

35.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.   That is because the building that is the subject of the policies-in-suit and claims-in-suit is located in Montgomery County, Pennsylvania.

## BACKGROUND AND FACTUAL ALLEGATIONS
### The Insurance Policies

36.     Plaintiff 740 Queen Street Associates LLC ("QSA") owns a building located at 740 Queen Street, Pottstown, Pennsylvania ("Insured Property").

37.     Plaintiff Titan International, Inc. ("Titan") leases the Insured Property from QSA.

38.     Plaintiffs collaborate closely on the maintenance of the Insured Property and have certain obligations between them as to the maintenance and repair of the Insured Property.

10

39. At all relevant times, the Insured Property was insured by two insurance policies: one policy issued by AXIS Surplus Insurance Company ("AXIS Policy") and one policy issued by Certain Underwriters at Lloyd's of London ("Lloyd's Policy") (together, "Policies"). The two Policies jointly provided coverage for direct physical loss or damage to the Insured Property, subject to a $50,000.00 per-occurrence deductible and a $2,500,000 combined per-occurrence limit shared equally by AXIS and Lloyd's.

40. Certain Underwriters at Lloyds of London issued the Lloyd's Policy on behalf of the following entities:  Ascot Specialty Insurance Company, Ascot Group Limited *d/b/a* Ascot Group, Ascot Syndicate No. 1414, QBE Syndicate No. 1886, Tokio Marine Kiln Syndicate No. 510, and Tokio Marine Kiln Syndicate No. 1880.  Thus, under this arrangement, these entities share the obligation to pay claims under the Lloyd's Policy.  The Lloyd's Policy provides that suits thereunder should be made on Lloyd's America, Inc.  For simplicity, all of these Defendants are collectively referred to as "Lloyd's Defendants."

41. The AXIS Policy provides coverage for "direct physical loss of or damage to covered property at an insured location caused by or resulting from any covered cause of loss."

42. The Lloyd's Policy provides coverage for "direct physical loss or damage to the [Insured Property] caused by all risk of direct physical loss or damage excluding flood, earthquake and equipment breakdown as further defined in [the Policy]."

<u>The Property Damage</u>

43. This case arises out of an incident where water was discovered flooding sections of the basement of the Insured Property, for which both Plaintiffs suffered damage.

44. Plaintiffs promptly contacted the proper municipal authority to assist in shutting off the building's water supply.  The initial attempt to turn off the water supply via a valve located to

the right of the Insured Property was unsuccessful. After further investigation, municipal employees identified a second valve and were able to turn off the water supply. This process took about ten days, during which the flooding continued.

45.     Once the flooding was halted, Plaintiffs pumped the water out of the basement before engaging Pye-Barker Fire & Safety ("Pye-Barker") to assess and repair the damage. Pye-Barker determined that the flooding was the result of a failed line as part of the building's fire sprinkler system. Because the pipe was located underground, Pye-Barker could not determine the precise cause of the failure.

46.     The same day the fire suppression line failed, bathroom fittings inside the Insured Property also failed and flooded the bathrooms. As these were the main bathrooms for the building, Titan had its maintenance team repair the bathroom fittings the same day.

47.     Plaintiffs received repair and retrofit proposals from Pye-Barker's Pennsylvania branch, Keystone Fire and Security ("KFS"), to repair the damaged line. The work would later prove to be more expensive than initially anticipated, and the final cost came to $188,923.04.

<u>Defendants' Delay</u>

48.     Shortly after receiving the initial estimates for the work, Plaintiffs reported this claim to their insurance broker, the Barclay Group ("Barclay").

49.     Barclay then reported Plaintiffs' claim on July 24, 2025. Due to an error in how the Policies were originally labeled (an error that Plaintiffs had nothing to do with), Barclay initially reported the claim only to Lloyd's and not to AXIS.

50.     On July 25, 2025, Perry Santosus, a Claims Manager at WKFC Underwriting Managers, sent a letter signed by a representative of Synergy Adjusting Corporation, acknowledging receipt of Plaintiffs' claim.

51. On or around September 26, 2025, the labelling error was discovered, and AXIS was also informed of Plaintiffs' claim.

52. AXIS and Lloyd's engaged Defendant Engle Martin to evaluate Plaintiffs' claim.

53. Titan's Chief Financial Officer, Hernan Rizo, represented Titan and QSA in discussing the claim with Defendants.

54. On October 3, 2025, Christopher Dec from Engle Martin, the firm assigned to handle Plaintiff's claim, emailed Mr. Rizo to schedule an inspection of the Insured Property.

55. On October 6, 2025, Bryan Noll conducted an inspection on behalf of Engle Martin. Mr. Noll inspected parts of the building and the exterior location of the underground pipes. Mr. Noll also took photographs and basic measurements of some of the damaged areas. Notably, however, Mr. Noll did not inspect the bathrooms where the fittings had also failed.

56. On October 7, 2025, Mr. Rizo emailed Mr. Noll photographs from when the flooding initially occurred and stated: "Please let me know if you need anything else."

57. Over a month later, on November 10, 2025, Mr. Dec wrote to Mr. Rizo: "Currently, we are still awaiting responses from Underwriters regarding coverage and further instructions. Please confirm that we are in agreement that the Cause of Loss is an old underground pipe from wear & tear. From my associate's investigation and conversation with your office, apparently the pipe is over 50 years old." Thus, the finding that the cause was "wear and tear" was apparently based solely on the date the pipe was originally installed.

58. On November 13, 2025, Mr. Rizo provided a copy of the final Pye-Barker report and noted that age alone was an insufficient basis to find that the cause was wear and tear.

59. On December 9, 2025, after another month of no further communication from Engle Martin, Mr. Rizo asked for an update on the status of the claim. On December 11, Mr. Dec

13

responded: "We are working on finalizing coverage analysis and next steps with the market. Update to follow shortly."

60.     Another month of silence passed. On January 15, 2026, Mr. Rizo again asked for an update on the status of the claim. Engle Martin did not respond.

61.     On January 20, 2026, Mr. Rizo followed up: "Any news on this? Why is this taking so long? We had a high pressure burst, water hammer, that busted pipes in our bathrooms and a main line under the building that flooded our basement. The main line had to be rerouted and replaced. Got a big bill to have this fixed and placed a claim to our insurance for it. Could not be a more clear-cut claim."

62.     The same day, Engle Martin finally responded: "The loss is due to failure of an underground pipe, and we are finalizing draft coverage letter for market review. We will update shortly." Four minutes later, Mr. Rizo responded: "A burst of high-pressure water can make any pipe fail. We've been waiting for months on your firm to make a decision on something that should be very straightforward. We're ready to pick up a fight over this tooth and nail. Please send me your review ASAP."

63.     On February 9, 2026, Rizo once again asked Engle Martin for an update.

64.     On February 10, 2026, more than 200 days after receiving notice of Plaintiffs' claim, Engle Martin sent Plaintiffs a letter denying coverage for this claim ("Coverage Denial Letter").

65.     Pennsylvania law requires that every insurer "complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time." 31 Pa. Code § 146.6. If an investigation cannot be completed within 30 days, the insurer is required, every 45 days thereafter, to "provide the claimant with a reasonable written

14

explanation for the delay and state when a decision on the claim may be expected." *Id.*

66. Defendants failed to comply with these mandatory obligations. Following the October 6, 2025 inspection, Defendants did not issue any written communication to Plaintiffs advising of the status of the investigation, the reasons for any delay, or when a coverage decision could be expected. Plaintiffs received no substantive communication from Defendants between the October 6, 2025 inspection and the February 10, 2026 Coverage Denial Letter.

67. This delay caused additional prejudice to Plaintiffs. Plaintiffs delayed payment to KFS in anticipation of receiving a decision from Defendants. After months of waiting, Plaintiffs decided to make payment directly to KFS, and incurred additional expenses in interest due to the delay. This interest was in addition to the $188,923.04 that KFS charged for the work. The delayed payment also significantly damaged the relationship between Plaintiffs and KFS.

<u>Defendants' Bad Faith Denial of Coverage</u>

68. Despite Defendants taking several months to provide the Coverage Denial Letter, the letter itself fails to provide a basis for denial of Plaintiffs' claim. Instead, the letter simply contains copied and pasted provisions and exclusions from the Policies (and some boilerplate language) without providing any further clarification or explanation as to how those provisions and exclusions apply to Plaintiffs' claim. Thus, to this day, Plaintiffs do not fully understand why their claim was denied.

69. Pennsylvania law prohibits this approach. Instead, an insurer must "provide [its insured] a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim." 40 Pa. C.S. § 1171.5(a)(10)(xiv). Defendants failed to meet this basic standard.

70. For instance, the Coverage Denial Letter stated: "Wear & tear / deterioration and

Earth Movement are not a named peril or covered cause of loss under the policy of insurance in question. . . ."

71.     But Defendants provided no explanation for how they determined the line failed due to "wear & tear," "deterioration," or "Earth Movement."  Defendants conducted only one inspection of the Insured Property during which the failed line itself was not evaluated.  Rather, Defendants apparently based their conclusion entirely on the fact that "[t]he Pye-Barker initial bid referenc[ed] sprinkler site plans from 1970, which would place the pipes at over 50 years of age."  Defendants did not even check whether any of the pipes had been repaired or replaced in the years before Plaintiffs became involved with the building, despite Mr. Rizo suggesting back in October 2025 that such a repair or replacement may have occurred.  As Plaintiffs understand it, Defendants also failed to inspect or evaluate the condition of the pipes as they existed on or about the date of failure.

72.     During their months-long delay, Defendants also improperly attempted to pressure Mr. Rizo into agreeing that wear and tear was the cause of the failure.  Based on the contents of the conclusory and unsupported Coverage Denial Letter, it is now clear that Defendants did so because they were hoping to obtain an admission from Mr. Rizo, which they could then use as a basis to deny coverage.  Such an attempt to trick an insured into making an admission to deny that insured the benefit of insurance coverage that it paid for is the epitome of bad faith.  Mr. Rizo disagreed and stated that the failure was caused by "a burst of high-pressure water."  But Defendants went on to entirely discount Mr. Rizo's statement and never investigated if the failed line could have been caused by anything other than wear and tear.

73.     Thus, not only did Defendants blindly assume that the failure was due to wear and tear based solely on the date the original pipes were installed, but Defendants also refused to

16

investigate any facts that might undermine this assumption.

74.   The Coverage Denial Letter also makes no mention of the bathroom fittings that failed simultaneously with the failed water line and does not indicate that Defendants ever considered or inspected the failed bathroom fittings.

75.   On April 10, 2026, Plaintiffs, through their attorneys, sent Mr. Dec of Engle Martin a letter enumerating the deficiencies in the Coverage Denial Letter and requesting that Defendants reverse their coverage denial and provide coverage for Plaintiffs' claim.  Again, Defendants did not substantively respond.

76.   Defendants' latest communication was on May 28, 2026.  However, this reply merely stated the matter is "a priority" and that Defendants are "in the process of reviewing file materials."

77.   Thus, to date, Defendants have neither substantively replied to Plaintiffs' April 10, 2026, letter nor reversed their improper denial of coverage.

78.   Defendant Synergy Adjusting, LLC (formerly Synergy Adjusting Corporation, Inc.) ("Synergy") is a claims administrator that operates as a subsidiary to Engle Martin. Defendant WKFC, a Series of RSG Underwriting Managers, LLC ("WKFC"), is an underwriting firm that served as the point of contact for any claims brought under the Lloyd's Policy.  Defendant RSG Underwriting Managers, LLC ("RSG") is the parent entity of WKFC or, alternatively, may be the true identity of WKFC, in which case it is an underwriting firm that served as the point of contact for any claims brought under the Lloyd's Policy.  Upon information and belief, Synergy, RSG, and WKFC have directly or through their agents participated in and ratified the foregoing improper actions by AXIS, Lloyd's Defendants, and Engle Martin and were otherwise involved in the improper denial of coverage.

17

79.    As of the filing of this complaint, Defendants have not reversed the denial, confirmed coverage, or provided any updated or revised coverage position.

## COUNT I
## BREACH OF CONTRACT

80.    Plaintiffs incorporate by reference all of the aforementioned paragraphs as though fully set forth herein.

81.    The Policies are valid written contracts between the parties.

82.    Plaintiffs have fully performed under the Policies by paying a premium for the Policies.  Plaintiffs also timely reported the insurance claim and cooperated with Defendants in this regard.

83.    The AXIS Policy provides coverage for "direct physical loss of or damage to covered property at an insured location caused by or resulting from any covered cause of loss."

84.    The Lloyd's Policy provides coverage for "direct physical loss or damage to the [Insured Property] caused by all risk of direct physical loss or damage excluding flood, earthquake and equipment breakdown as further defined in [the Policy]."

85.    During the policy period of both Policies, a failed pipe in the Insured Property's fire sprinkler system caused flooding in the basement.  At the same time, bathroom fittings in the Insured Property also failed and caused additional flooding.

86.    On July 24, 2025, Plaintiffs' insurance broker reported the claim to Lloyd's.  The claim was reported to AXIS on or around September 26, 2025.

87.    The water damage to Plaintiffs' property is "damage to" the Insured Property that falls within the broad coverage provisions of both the AXIS Policy and the Lloyd's Policy.

88.    On February 10, 2026, Defendants breached the Policies by denying Plaintiff coverage, even though such claim was covered under the Policies.

18

89.     As a result of Defendants' breach of the Policies, Plaintiffs have suffered damages of greater than $180,000 due to the expensive repairs required to rectify the property damage.

**COUNT II**
**DECLARATORY RELIEF (28 U.S.C. § 2201)**

90.     Plaintiffs incorporate by reference all of the aforementioned paragraphs as though fully set forth herein.  In the alternative to Count I and pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiffs seek a declaration of their rights under the Policies pursuant to 28 U.S.C. § 2201.

91.     The AXIS Policy provides coverage for "direct physical loss of or damage to covered property at an insured location caused by or resulting from any covered cause of loss."

92.     The Lloyd's Policy provides coverage for "direct physical loss or damage to the [Insured Property] caused by all risk of direct physical loss or damage excluding flood, earthquake and equipment breakdown as further defined in [the Policy]."

93.     During the policy period of both Policies, a failed pipe in the Insured Property's fire sprinkler system caused flooding in the basement.  At the same time, bathroom fittings in the Insured Property also failed and caused additional flooding.

94.     On July 24, 2025, Plaintiff's insurance broker reported the claim to Lloyd's.  The claim was reported to AXIS on or around September 26, 2025.

95.     On February 10, 2026, Defendants breached the Policies by denying Plaintiffs coverage, even though such claim was covered under the Policies.

96.     As a result of Defendants' breach of the Policies, Plaintiffs have suffered damages of greater than $180,000.

97.     Given the nature of the dispute, there exists a justiciable controversy in which Plaintiffs have a vested interest.  Seeking declaratory relief from this Court will effectively resolve

this controversy and eliminate the uncertainty arising from Plaintiffs' inability to obtain insurance benefits to which it is legally entitled.

98.    As discussed above, a real, substantial, and immediate controversy surrounds the rights, duties, and liabilities of the parties involved.  Consequently, and in the alternative to Plaintiffs' claim in Count I, Plaintiffs request a declaratory judgment from this Court, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, affirming Plaintiffs' entitlement to insurance benefits under the Policies, given the circumstances.

## COUNT III
## BAD FAITH (42 PA. C.S. § 8371)

99.    Plaintiffs incorporate by reference all of the aforementioned paragraphs as though fully set forth herein.

100.    Defendants did not, and cannot, provide a reasonable basis for why Plaintiffs' claim was denied.  Despite their significant delay in evaluating Plaintiffs' claim, Defendants conducted a single, lackluster inspection of the Insured Property and drew the unsupported conclusion that the water line failure was caused by wear and tear based solely on the date of initial installation and without any further investigation into other potential causes.  Defendants' bad faith is further demonstrated by their attempt to trick Plaintiffs into agreeing to the cause of the failure before issuing a decision on Plaintiffs' claim.  When Defendants finally issued a decision, the Coverage Denial Letter simply quoted swaths of language from the Policies without any explanation as to how those provisions supposedly applied to Plaintiffs' claim.

101.    Defendants recklessly disregarded the fact that they lacked a reasonable basis to deny Plaintiffs' claim.  Defendants' conduct demonstrates that Defendants made a hasty and unsupported determination that the failure was caused by wear and tear in an attempt to escape the coverage Plaintiffs are entitled to.  Defendants' failure to investigate any possibilities that might

20

undermine their self-serving assumptions confirms that they knew their basis for denial of coverage was flimsy and did not want to endanger it by seeking actual facts.

58.    Accordingly, § 8371 entitles Plaintiffs to not just payment of the full amount of the claim, but also to (1) interest on the amount of the claim from the date the claim was made by Plaintiffs in an amount equal to the prime rate of interest plus 3%, (2) punitive damages, and (3) recovery of Plaintiffs' court costs and attorney fees. *See* 42 Pa. C.S. § 8371(1)–(3) (prescribing these remedies).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests judgment in its favor against Defendants as follows:

1.    For compensatory damages in the full amount of the unpaid claim;

2.    Alternatively, for a declaratory judgment that Plaintiffs' claim is covered under the Policies and that Defendants must pay Plaintiffs' insurance claim entirely, the value of which judgment is no less than the value of the unpaid claim;

3.    For punitive damages as provided in 42 Pa. C.S. § 8371(2) and for all other applicable reasons;

4.    For an award of all costs and attorney fees incurred by Plaintiffs as provided in 42 Pa. C.S. § 8371(3) and for all other applicable reasons;

5.    For prejudgment interest from the date the claim was made by the insured in an amount equal to, as may be applicable, the prime rate of interest plus 3% as provided in 42 Pa. C.S. § 8371(1) and/or the statutory rate, and for all other applicable reasons;

6.    For post-judgment interest; and

7.    For such other and further relief as may be appropriate.

21

## DEMAND FOR JURY TRIAL

Trial by jury is hereby demanded as to all issues so triable.


Dated:                                      /s/ *CSD'Angelo*
                                            Christopher Scott D'Angelo (PA ID 28463)
                                            Montgomery McCracken Walker & Rhoads LLP
                                            1735 Market Street, 20th Floor
                                            Philadelphia, PA 19103
                                            (215) 772-7397
                                            cdangelo@mmwr.com

                                            Ellis L. Bennett (Va. Bar No. 71685)
                                            *Pro hac vice forthcoming*
                                            DUNLAP BENNETT & LUDWIG PLLC
                                            211 Church Street SE
                                            Leesburg, VA 20175
                                            (703) 777-7319
                                            ebennett@dbllawyers.com

                                            Cortland C. Putbrese (Va. Bar. No. 46419)
                                            *Pro hac vice forthcoming*
                                            DUNLAP BENNETT & LUDWIG PLLC
                                            9011 Arboretum Parkway Suite 390
                                            Richmond, Virginia 23236
                                            (804) 977-2688
                                            cputbrese@dbllawyers.com

                                            *Counsel for Plaintiffs*

22